BUNTIN *v.* KATZ

No. 43456 April 12, 1965 173 So. 2d 659

*Robert B. Adam,* Gulfport, for appellant.

*Richard L. Yarbrough,* Gulfport, for appellee.

LEE, C. J.

Samuel B. Katz filed this suit against Robert R. Buntin, seeking judgment in the sum of $10,000, plus interest, and a reasonable attorney's fee.

The answer of the defendant admitted the execution by him of the note; but he alleged that he advised Katz that it was being worked out in fees; and he denied that the plaintiff was a holder in due course before the maturity of the note. He alleged that, when plaintiff demanded payment, the defendant advised that payment had already been made by him in fees and services which had been rendered to the payee. The answer also contained a counterclaim for damage, because of the alleged wrongful institution of the suit.

The note in question was dated March 30, 1959. It was a promise to pay in one year after date to the order of the bearer the sum of $10,000, with interest from

maturity at the rate of six percent until paid, and also for attorney's fees.

Admittedly Buntin delivered the note to one Harry Bennett. At the time Buntin was engaged, with his son-in-law, Ernest Martin, in the practice of law at Gulfport. This firm had represented Harry Bennett, and was also representing Katz.

Katz operated a large financial business. According to his version, in the summer of 1959, Harry Bennett, his uncle, wanted him to purchase Buntin's note. A month or six weeks later, when he was in the office of Buntin and Martin, he told Buntin about Bennett's request. According to his evidence, Buntin said: "It is my note and I am going to pay it. But, Katz, do me a favor, don't say anything to Ernest about it." To that statement Katz replied: "Bob, it is none of his business, and if you don't want it told, I won't say anything about it." He said that, several weeks later, he bought the note from Bennett. He also said that he purchased the note because the firm of Buntin and Martin had represented him at that time for well over a year, and he felt, while he was on the stand, as he did at the time of the purchase, that it was a very reputable firm. He stated that he had never asked Buntin for payment until October 1963. When he then demanded payment, nothing was forthcoming.

On cross-examination, Katz stated that nothing had been paid against the principal; that each year it had been rediscounted to him by Bennett; that the first payment was September 1, 1960 for $1,000; the second payment, September 1, 1961, for $1,000; and the third payment, September 1, 1962, for another $1,000. He never at any time received any payment from Buntin. He had paid $9,000 for the note, $3,000 in cash and a credit of $6,000 "downstairs". He said that the note had been in his possession since he bought it. He admitted that a letter, dated November 18, 1963, written to Buntin

concerning payment of the note, was signed by Leon Levy, Jr., one of his assistants or associates. He had made no demand for payment until after the note had been turned over to counsel for collection, over four years after its execution. He admitted that he looked to Bennett for payment because he had already made three payments; and that he looked to Buntin, because he confirmed it before his purchase. He admitted that Buntin did not encourage him to buy the note, and that he did not advise Buntin that he had done so. He also admitted that he did not send a copy of this note when this had been requested by Buntin.

Robert R. Buntin testified that he had practiced law since 1921; and at the time of this occurrence, he was practicing with his son-in-law, Ernest Martin. He said that Katz came into the office and said: "Bob, I am contemplating buying this note from Harry Bennett. Did you sign it?" His reply was: "Yes, Katz, I signed it, but it is being worked out with Harry in fees." That was all of the conversation. As to the testimony of Katz that he told him, "don't tell Ernest about it", he said he did not know why he would have said such, because there was not anything secret about it. He did not remember having said that, and did not believe that he did so.

Buntin's version of how this note came about was substantially as follows: He had been handling income tax assessments made against Jack Dennis and Harry Bennett, who were partners in the operation of the Padlock Club. These assessments grew out of that operation during 1951-1952 and perhaps 1953. The government made its assessment for these income taxes. He had handled the Dennis case, and, after filing suit, a settlement was agreed upon and the government refunded the amount wrongfully collected. He was also handling Bennett's case and the government agreed to make the same basic settlement. However, Bennett in-

sisted on getting more and Buntin had to continue his efforts to that purpose. The matter was delayed through these negotiations and was not finally settled until 1961. Bennett had never paid any interest; and when his case came up for settlement, there was a large accumulation on the $34,000 which aggregated $48,000. The fee in this matter was $10,000, but its collection was delayed until the full consummation. That accounted for Bennett's paying him the $10,000, and his giving a note therefor. In other words, his contention was that the fee had been earned; that it had not then been paid but was due; that he gave this note to Bennett on that account; and that the note should have been marked paid when the formal settlement was consummated in 1961. This was in explanation of what he had in mind when Katz was asking about the signature on the note, and he then told him that the note was being worked out through fees.

Harry Bennett testified that Buntin was his lawyer for about 18 years, that he paid him a retainer of $100 per month; that Buntin settled a tax case for him for the period 1951, 1952 or 1953, but he did not owe a fee in excess of $10,000 then, nor does he owe it now. He said that Buntin had owed him $10,000 for which he held a deed of trust, but that it had not been recorded, and that Buntin sold the property and did not pay the debt. In 1959 Buntin had needed the money and when Bennett advanced it to him, Buntin gave the note, saying it was as good as "George Washington on a dollar bill." His nephew asked him if there was any objection to his taking the note to Buntin, and since there was none, he did so, Katz accepted it, and he made the yearly payments because Buntin had told him that he was unable to do so. (Buntin had previously made denial of all evidence to that effect.)

Bennett, on cross examination, while first stating that he was a "price maker", later admitted that he was a "professional gambler.'

Ernest Martin testified that Bennett had paid their firm a retainer of $100 per month for a number of years prior to 1955 or 1956. Several times after that, he had paid them small fees occasionally. He corroborated Buntin as to the handling of the Dennis case, and said that by August 1959 Bennett owed the firm the same fee that Dennis did. The witness knew that Buntin owed Bennett, and Bennett owed Buntin more, and, in settling their partnership, they "squared their accounts off" and Buntin took, in the dividion, the claim which they had against Bennett. He was certain that Bennett owed on the claim more than Buntin owed him.

At the close of the evidence, the court gave a directed verdict to the jury for it to find for the plaintiff. The judgment to that effect was entered, and Buntin has appealed.

The appellant contends that the trial court was in error in giving that instruction. He says that the appellee, at the time that the alleged purchase by him occurred, had knowledge of an infirmity in the note or knowledge of such fact that his action in taking the instrument would amount to bad faith. At lease, he says, the evidence was in dispute, and the court could not peremptorily say that such knowledge did not exist; or, on the contrary, this sharply disputed issue should have been submitted to the jury for determination.

Section 93, Mississippi Code Annotated (1956), as to what constitutes a holder in due course, provides in part as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions: . . .

"(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 95 Mississippi Code Annotated (1956), as to notice before full amount is paid, provides as follows: "Where the transferee receives notice of any infirmity

in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him.''

Section 100 Mississippi Code Annotated (1956), as to what constitutes notice of defect, provides as follows: *''To constitute notice of an infirmity in the instrument* or defect in the title of the person negotiating the same, *the person to whom it is negotiated must have had* actual knowledge of the infirmity or defect or *knowledge of such facts that his action in taking the instrument amounted to bad faith.''* (Emphasis supplied.)

11 Am. Jur. 2d *Bills and Notes* sec. 425 (1963), contains, at pages 455-7, an excellent statement concerning notice and good or bad faith:

''Under the NIL notice means actual notice and not constructive notice. To constitute *notice of an infirmity in the instrument or defect in the title* of the person negotiating the same, *the person* to whom it is negotiated *must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.*

''Good faith as a requisite of holder-in-due-course status entails the absence of bad faith and of guilty knowledge or notice. The requirement of *'good faith'* imposed by the NIL generally *means that the transaction was honestly conceived and consummated without collusion, fraud, knowledge of fraud, or intent to assist in the perpetration of a fraudulent* or otherwise unlawful design. To be a purchaser in good faith means that at the time one takes an instrument he acts honestly and fairly under the facts and circumstances within his knowledge with respect to the rights of all prior parties, particularly those with whom he knows his transferor occupied a relationship of trust, and in a manner free from the taint of any illegality. . . .

It is generally stated that the *test of bad faith is* not the objective one of prudence, due care, negligence, diligence, or failure to inquire, but *knowledge of facts which render the taking dishonest*. To constitute evidence of bad faith, the facts known to the taker must be such as to reasonably form the basis for an inference that in acquiring the instrument with knowledge or such facts, be acted in dishonest disregard of the rights of the defendant. While knowledge of facts sufficient to cause one of ordinary prudence to make inquiry is not evidence of bad faith, *a purchaser may not purposely refrain from making inquiry which would result in knowledge of a defense. . . .*'' (Emphasis supplied).

Section 431 of the above text, at pages 463-4 thereof says:

''The question is not what facts will or will not be sufficient to put the party on inquiry or one of negligence or diligence, but of honesty and good faith, or whether the purchaser purposely refrained from making inquiry which would have resulted in knowledge of a defense. . . .

*"Nevertheless,* suspicious circumstances known to the person taking the instrument, or *the knowledge of facts which would have put the ordinary man on inquiry, may constitute evidence of bad faith if the holder believed that there was some defect or infirmity in the paper or that investigation would disclose such; and a jury may find knowledge of suspicious circumstances to show bad faith as a matter of fact. . . .*'' (Emphasis supplied.)

Finally, section 438 of said text, at pages 472-3, answers the question as to whether the issue is for the court or jury, as follows:

''The question whether, under the applicable definition of good faith or notice, a holder took the instrument in good or bad faith or without such knowledge as constitutes notice of defects or infirmities is ordinarily— that is, where there is conflicting evidence or conflicting

inferences may be drawn from the evidence—a question of fact to be determined on the evidence by the jury or other trier of fact, and, if by the jury, under proper instructions from the court. Evidence of suspicion, or the knowledge of circumstances which would excite suspicion in the mind of a prudent man, will not establish bad faith as a matter of law, but *a jury may find knowledge of suspicious circumstances to show bad faith as a matter of fact. . . .*'' (Emphasis supplied.)

Appellee cites Securities Investment Co. v. Cohen, 241 Miss. 549, 131 So. 2d 439 (1961). However, a study of this case reflects that the contention of the appellee that he was a holder in due course was rejected. Besides, the knowledge of such facts that would amount to bad faith was reiterated.

The rules, set out in the American Jurisprudence citations, *supra,* apply in this instance. It is clear that the issue was in sharp dispute as to whether the appellee, from the facts and circumstances in this case, ''had knowledge of such facts that his action in taking the instrument amounted to bad faith''. That issue was for the jury to decide. Consequently, the court should have submitted it to them.

Reversed and remanded.

*Gillespie, Rodgers, Jones, and Brady, JJ.,* concur.